**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHELLE TAYLOR, | ) | CASE NO. 5:16CV2107 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Michelle Taylor ("Plaintiff" or " Taylor"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In June 2013, Taylor filed applications for POD, DIB, and SSI, alleging a disability onset

date of June 2, 2012 and claiming she was disabled due to "fibromyalgia, lower back tarlov cyst,

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

myositis, lupus, four bulging discs in back, bursitis in hip, SI joints in hips, depression, [and] social anxiety."[2]  (Transcript ("Tr.") 19, 232, 265.)  The applications were denied initially and upon reconsideration, and Taylor requested a hearing before an administrative law judge ("ALJ").  (Tr. 166-172, 179-191.)

On June 5, 2015, an ALJ held a hearing, during which Taylor, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 33-65.)  On June 25, 2015, the ALJ issued a written decision finding Taylor was not disabled.  (Tr. 19-32.)  The ALJ's decision became final on June 30, 2016, when the Appeals Council declined further review.  (Tr. 1-6.)

On August 23, 2016, Taylor filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17.) Taylor asserts the following assignments of error:

(1)    The ALJ erred in adopting the prior ALJ's residual functional capacity finding pursuant to the *Drummond* holding.

(2)    Remand is warranted for the consideration of new and material evidence.

(Doc. No. 15.)

---

[2] The record reflects Taylor filed previous applications for POD, DIB and SSI in October 2010, alleging an onset date of June 28, 2010.  (Tr. 19, 69, 153.)  The applications were denied initially and upon reconsideration, and Taylor requested a hearing before an ALJ. (*Id.*)  The ALJ conducted a hearing on May 7, 2012, during which Taylor, represented by counsel, and an impartial VE testified.  (*Id.*)  On June 1, 2012, the ALJ issued a written decision finding Taylor was not disabled.  (Tr. 69-83.)  Taylor requested review before the Appeals Council, which denied review.  (Tr. 154.)  Taylor thereafter appealed to the United States District Court for the Northern District of Ohio.  *See Taylor v. Comm'r of Soc. Sec.*, Case No. 1:14CV338 (N.D. Ohio).  On October 15, 2014, Magistrate Judge George Limbert issued a Memorandum Opinion & Order affirming the decision of the ALJ.  *Id.* at Doc. No. 20.  *See also Taylor v. Comm'r of Soc. Sec.*, 2014 WL 5302977 (N.D. Ohio Oct. 15, 2014).

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Taylor was born in May 1970 and was forty-five (45) years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 26.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has a limited education and is able to communicate in English.  (*Id.*)  She has past relevant work as a fast food worker, fast food manager, and packer.  (Tr. 26.)

### B.   Medical Evidence

On June 8, 2012, Taylor presented to Guang Yang, M.D., with complaints of lumbar spine and left chest wall/rib pain.  (Tr. 709-711.)  She rated her pain an 8 on a scale of 10, and described it as aching and shooting.  (Tr. 709.)  Taylor indicated her current pain treatment plan was "working appropriately to control [her] pain, except for her rib pain," and allowing her to do her activities of daily living and to be more physically active.  (Tr. 710.)  She stated SI joint injections "did help a lot for her hip pain, but for the past 8-9 days she has been having unrelenting severe left chest wall pain."  (*Id.*)  Taylor also complained of low back pain, muscle spasms, and poor sleep.  (*Id.*)

On examination, Dr. Yang noted Taylor was "in no acute pain" and ambulating without difficulty.  (Tr. 710.)  Taylor's thoracic and lumbar spines were positive for pain on palpation, and muscle tightness and spasm was noted.  (*Id.*)  With regard to Taylor's thoracic spine, Dr. Yang noted "radicular pain questionably positive – following T8 T9."  (*Id.*)  With regard to her lumbar spine, Dr. Yang noted radicular pain and limited range of motion in all planes.  (*Id.*)  Dr. Yang continued Taylor's current medications (Xanax, Valium, Roxicodone, MS Contin, and

Dilaudid) and added Toradol for five days to treat acute flare up of chest wall pain.  (Tr. 711.)

On August 3, 2012, Taylor presented to James Bressi, D.O., for treatment of thoracic spine, lumbar spine, and left leg pain.  (Tr. 705-708.)  Taylor stated her "back pain has been getting a lot worse over the past 2-3 months and it bothers her breathing and she has new constant 'vibrating' numbness in left pelvis and left lateral thigh."  (Tr. 706.)  She also complained of ongoing bursitis pain in her right lateral hip, although she admitted to some relief with Voltaren Gel.  (*Id*.)  Taylor stated she could not lie on either her right or left side, making it difficult to sleep.  (*Id*.)

On examination, Dr. Bressi noted Taylor could ambulate without difficulty and was in no acute distress.  (*Id*.)  She was positive for thoracic pain on palpation and muscle tightness/spasm but negative for radicular pain.  (*Id*.)  With regard to Taylor's lumbar spine, Dr. Bressi noted pain on palpation, muscle tightness/spasm, limited range of motion in all planes, positive radicular pain on the left, and positive straight leg raise and positive sciatic stretch on the left.  (Tr. 706-707.)  Taylor's right lower extremity was positive for tenderness on palpation, but negative for swelling, atrophy, or allodynia.  (Tr. 707.)  Her right leg strength was 5/5, and her reflexes and range of motion were both normal.  (*Id*.)  Dr. Bressi continued Taylor on her medications and ordered thoracic and lumbar MRIs.  (*Id.*)

Taylor underwent the MRIs on August 14, 2012.  (Tr. 591-598.)  The MRI of her lumbar spine showed mild degenerative disc disease at the L4-L5 and L5-S1 levels; a small broad-based posterior central disc herniation at the T5-S1 level; and no central canal stenosis or significant neural foraminal narrowing.  (Tr. 591, 707.)  The MRI of her thoracic spine showed multi-level disc herniation causing minimal to mild multi-level cord deformity, most pronounced at T7-8,

T9-10, and T11-12. (Tr. 593, 707.)

Taylor returned to Dr. Bressi on October 4, 2012, with complaints of lower thoracic and lumbar spine pain. (Tr. 701-704.) She stated her current medication regimen was working appropriately to control her pain, and allowing her to do her activities of daily living. (Tr. 702.) She did, however, complain of radiating pain "as a pulling and vibrating sensation in the left medial thigh to knee." (*Id*.) Examination revealed pain to palpation in Taylor's thoracic and lumbar spines, as well as muscle tightness and spasm. (*Id*.) She was negative for thoracic radicular pain, but positive for lumbar radicular pain and limited range of motion. (*Id*.) Dr. Bressi continued her medications and ordered injections. (Tr. 703.)

Shortly thereafter, on October 12, 2012, Taylor returned to Dr. Bressi with complaints of right hip pain which she rated a 10 on a scale of 10. (Tr. 697-700.) She also reported "extra pain going down the back of her leg as well as into the groin and into the foot." (Tr. 699.) On examination, Dr. Bressi noted 4-5/5 strength in Taylor's bilateral upper and lower extremities, as well as intact reflexes and sensation. (*Id*.) He noted Taylor was "very tender at the greater trochanter region as well as the right sacroiliac joint is found to be displaced, tender, and very restricted in forward bending." (*Id*.) He performed osteopathic manipulation "with excellent results of full forward bending being restored" and noted Taylor's groin pain was resolved. (*Id*.) Later that month, Taylor underwent right sacroiliac joint and right trochanteric bursal injections. (Tr. 687-690, 692-695.)

On November 7, 2012, Taylor presented to Jianhua Wang, M.D., with complaints of difficulty urinating. (Tr. 763-769.) She reported having to "strain hard to get urine stream going" and "even after emptying bladder, she still has some urge to go." (Tr. 767.) Taylor was

catheterized during the appointment. (Tr. 768.) Dr. Wang assessed urinary tract infection, ordered blood work, and prescribed antibiotics. (*Id*.) She also referred Taylor to a urologist for follow-up. (*Id*.) Taylor presented to urologist Irina Jaeger, M.D., the following day. (Tr. 770-783.) On examination, Dr. Jaeger noted no tenderness in Taylor's spine or flanks, and no edema in her bilateral lower extremities. (Tr. 776.) She assessed urinary tract infection, and ordered ultrasounds of Taylor's bladder and kidney. (*Id*.) Later that month, on November 28, 2012, Taylor presented for education regarding self-catheterization. (Tr. 782-783.) She was advised to self-catheter three times per day or as needed, and increase her water consumption. (Tr. 783.)

On November 16, 2012, Taylor returned to Dr. Yang with complaints of thoracic and lumbar spine pain as well as recent onset of "tingling or vibratory sensation" in her right lateral chest wall. (Tr. 683-686.) She again stated her current medication regimen was working appropriately to control her pain, and allowing her to do her activities of daily living. (Tr. 684.) Taylor indicated she experienced "some relief" from her recent SI joint injection, but reported it had "worn off." (*Id*.) Examination revealed thoracic and lumbar spine pain on palpation, as well as muscle tightness/spasms. (*Id*.) Taylor was negative for radicular pain and ambulated without difficulty, but did have limited lumbar range of motion in all planes. (Tr. 684-685.) Dr. Yang ordered injections of her left SI joint, which Taylor underwent on November 29 and December 17, 2012. (Tr. 673-682.)

On January 18, 2013, Taylor presented to Dr. Yang with complaints of lower back and right hip pain which she rated a 7 on a scale of 10. (Tr. 669-672.) She described her symptoms as follows:

> Pt states pain from right hip radiates down her right thigh. Prolonged standing
> and walking worsens pain. Injections seem to last only one month. She states she

> gets muscle spasms when [she] exercises. She has not gotten x-ray and MRI of her back per neurologist who told her he could do a fusion but would not be helpful. . . . Patient states current pain medication regimen is working appropriately to control [her] pain. . . . Patient states [her] current pain treatment plan is allowing her to do her ADL's and be more physically active. The patient is staying as physically active as the pain will allow [her] to be. . . . She states she enjoys being in the pool – aquatherapy was helpful.

(Tr. 670.) On lumbar spinal examination, Dr. Yang noted pain on palpation and right sacroiliac joint tenderness with limited range of motion but no muscle spasms or radicular pain. (*Id*.) With regard to her right lower extremity, Dr. Yang found Taylor was "extremely positive for tenderness to palpation hip joint" but her range of motion was normal and her strength was 4-5/5. (Tr. 670-671.) Examination of Taylor's left lower extremity was normal. (Tr. 671.) Dr. Yang continued Taylor on her medications and "discussed joining a fitness facility with a pool." (*Id*.)

Taylor returned to Dr. Yang on February 22, 2013. (Tr. 666-668.) She complained of pain in her lumbar spine, bilateral ribs, and lower back, and reported flare-ups "where the pain makes her vomit." (Tr. 667.) Overall, however, she reported her current medication regimen was working appropriately to control her pain, and allowing her to do her activities of daily living. (*Id*.) Examination of Taylor's thoracic and lumbar spines revealed pain on palpation but no muscle tightness/spasms or radicular pain. (*Id*.) Dr. Yang adjusted Taylor's medications, weaning her off several of them as follows:

> Xanax has already been discontinued so that now Valium is her only benzodiazepine. Will now have her taper off the Roxicodone 15 mg by decreasing one dose every five days. When she is down to taking the Roxicodone three times a day, she can increase her MS Contin 15 mg to two tablets twice a day until her next refill, when we will switch it to 30 mg one tablet twice a day. This will make Dilaudid her only short-acting opioid.

(Tr. 668.)

On May 9, 2013, Taylor returned to Dr. Yang with complaints of pain in her lumbar spine and right hip which she rated a 9 on a scale of 10. (Tr. 662-665.) Taylor again reported her current medication regimen was working appropriately to control her pain, and allowing her to do her activities of daily living. (Tr. 663.) She did, however, state her right hip was "very painful and burning constantly." (*Id*.) Examination of Taylor's lumbar spine was positive for pain on palpation but her range of motion was normal and she was negative for radicular pain and muscle spasms. (Tr. 664.) With regard to her right lower extremity, Dr. Yang found Taylor was "positive for tenderness to palpation over hip joint" but her range of motion was normal, her strength was 4/5, and she was negative for swelling, atrophy, and allodynia. (*Id*.) Examination of Taylor's left lower extremity was normal. (*Id*.) Dr. Yang continued Taylor on her medications and added a Medrol Dosepak for acute inflammation. (*Id*.)

Taylor returned to Dr. Yang on June 18, 2013. (Tr. 658-661.) She reported her current pain medication regimen was not working to control her pain, and indicated her activity was "very limited by pain." (Tr. 659.) She reported "low back pain bilaterally, constant, radiating into left hip and down left thigh as a burning pain with numbness," as well as right hip pain. (*Id*.) Taylor reported good relief from SI joint and trochanteric bursal injections in the past and requested them again. (*Id*.) Examination of Taylor's lumbar spine was positive for pain on palpation. (*Id*.) Her lumbar range of motion was "extremely limited" in all planes, but she was negative for radicular pain and muscle spasms. (*Id*.) Dr. Yang added Neurontin and ordered bilateral SI joint and right trochanteric bursal injections. (Tr. 660.) Taylor underwent the bilateral SI joint injections on July 16 and 23, 2013. (Tr. 650-657.)

On July 29, 2013, Taylor presented to Dr. Yang with complaints of lumbar spine and

right hip pain which she rated an 8 on a scale of 10.  (Tr. 646-649.)  She stated she had "not seen much benefit from the injections so far because she still has the hip pain," but reported some relief from the Neurontin.  (Tr. 647.)  Examination revealed Taylor was "in no acute pain" and could ambulate without difficulty.  (*Id.*)  Lumbar spinal examination was positive for very mild pain on palpation and her range of motion was mildly limited on all planes.  (*Id.*)  Her right lower extremity was positive for tenderness to palpation, but negative for swelling, atrophy, and allodynia.  (Tr. 647-648.)  Her right leg strength was 5/5 and range of motion was normal.  (Tr. 648.)  Dr. Yang adjusted her medications by weaning her off Valium and increasing her Neurontin.  (*Id.*)  He ordered further injections, which Taylor underwent on July 31 and August 5, 2013.  (Tr. 638-645.)

Taylor returned to Dr. Yang on August 27, 2013.  (Tr. 634-637.)  She reported pain in her lower back, lumbar spine, and right hip which she rated a 7 on a scale of 10.  (Tr. 634-635.)  Taylor stated the right hip and SI joint injections were "very helpful" but complained of constant lower back pain with shooting pains down her anterior thighs to her knees with a "vibration feeling."  (Tr. 635.)  Taylor reported increased pain with prolonged sitting and standing, and muscle spasms in her neck to shoulder since being weaned off Valium.  (*Id.*)  She indicated her current pain treatment plan was not appropriately controlling her pain, and stated she "would like to discuss changing" that plan.  (*Id.*)  Lumbar spinal examination was positive for pain on palpation and her range of motion was mildly limited on all planes, but no muscle spasms or radicular pain was noted.  (*Id.*)  Cervical spinal examination was positive for pain on palpation with muscle spasms noted and limited range of motion on right lateral rotation.  (*Id.*)  Radicular pain was negative and strength/tone were normal.  (*Id.*)  Examination of Taylor's right and left

lower extremities was normal.  (*Id.*)  Dr. Yang increased Taylor's MS Contin, decreased her

Dilaudid, and started her on Flexeril.  (Tr. 636.)

On September 26, 2013, Taylor presented to Dr. Yang with complaints of lumbar spine

and right hip pain.  (Tr. 630-633.)  She stated the injections helped alleviate her low back pain,

but her right hip pain was "severe."  (Tr. 631.)  Taylor also complained of numbness and a sense

of vibration in her thighs, and indicated "her right leg gives out without warning, causing her to

fall."  (*Id.*)  She "doesn't feel she gets enough support with a cane because she has fallen while

using it," and requested a walker.  (*Id.*)  Lumbar spine examination was positive for "very mild

pain" and range of motion was limited in all planes; however, muscle spasm was not noted and

examination was negative for radicular pain.  (*Id.*)  Dr. Yang also noted Taylor's hip range of

motion was moderately limited by pain.  (*Id.*)  He adjusted Taylor's medications by

discontinuing Dilaudid and restarting Roxicodone.  (Tr. 632.)  In addition, he ordered an x-ray of

Taylor's right hip and ordered a walker "to assist with safe ambulation."  (*Id.*)  Taylor underwent

an x-ray of her right hip that day, which showed minimal degenerative changes.  (Tr. 722.)

On November 21, 2013, Taylor presented to Robert S. Geiger, M.D., with complaints of

pain in her lumbar spine and right hip.  (Tr. 875-877.)  She reported "her pain is getting

progressively worse and now starting to go down left leg as well as right leg."  (Tr. 876.)  Taylor

stated "current pain medication regimen is working fairly well to control [her] pain" and

indicated that "the series of lumbar injections and right hip injection she had back in July did

alleviate her pain very well for a couple months."  (Tr. 876.)  She also reported her current

treatment plan was allowing her to do her activities of daily living and to be more physically

active.  (*Id.*)  Examination of Taylor's lumbar spine was positive for pain on palpation and

radicular pain on the bilateral S1 nerve roots.  (*Id.*)  Dr. Geiger continued Taylor's medications and ordered a Medrol Dosepak as well as a "new lumbar MRI to evaluate for progression of L5-S1 disc herniation in light of worsening condition."  (Tr. 877.)

Taylor returned to Dr. Geiger on January 16, 2014.  (Tr. 871-874.)  She complained her "right hip is extremely sensitive to touch and she has had to use her cane a lot more lately."  (Tr. 872.)  Taylor also reported right hand numbness for three weeks, and "aching pain in her legs, like they are being crushed, especially at night."  (*Id.*)  She indicated her current pain treatment plan was working "partially" to control her pain, and requested another round of injections.  (*Id.*)  Lumbar spine examination was positive for pain on palpation and limited range of motion on flexion, but negative for muscle spasms and radicular pain.  (*Id.*)  Examination of Taylor's right lower extremity was "positive for significant tenderness to palpation lateral hip," but negative for swelling, atrophy, allodynia.  (*Id.*)  Her right leg range of motion was normal and her strength was 5/5.  (*Id.*)  Dr. Geiger ordered right SI joint and right trochanteric bursal injections, which Taylor underwent on January 17 and 23, 2014.  (Tr. 873, 863-870.)

On April 10, 2014, Taylor presented to Dr. Geiger with complaints of "constant lower back pain with pain radiating into her left hip and top of her thigh."  (Tr. 859-862.)  She stated her current pain medication regimen was working appropriately to control her pain, and allowing her to do her activities of daily living.  (Tr. 860.)  Dr. Geiger ordered a left SI joint injection, which Taylor underwent on April 18, 2014.  (Tr. 855-858.)

On May 2, 2014, Taylor presented to certified nurse specialist Lois L. Nicholson, C.N.S., for treatment of depression, insomnia, and panic attacks.  (Tr. 802-808.)  She reported a history of depression and anxiety "off and on" since 2001, and indicated she had taken numerous

medications over the years (e.g., Paxil, Zoloft, Prozac, Cymbalta, Effexor, Wellbutrin, Ativan, Xanax, and Clonazepam) but had been unable to tolerate them due to various side effects. (Tr. 804.) Taylor reported having depressed mood daily with anhedonia, decreased appetite, difficulty sleeping, feelings of worthlessness and excessive or inappropriate guilt, difficulty concentrating, fatigue and loss of energy and motivation. (Tr. 805.) She also reported panic attacks several times per week. (*Id.*)

On mental status examination, Nurse Nicholson noted Taylor's affect was blunted and her mood was depressed. (Tr. 805.) She had good eye contact, insight, judgment, and remote memory. (*Id.*) Nurse Nicholson also noted Taylor's "attitude was cooperative and there was no evidence of a thought disorder, and her thought process was logical and coherent." (*Id.*) She diagnosed bipolar disorder Type 1 depressed, panic disorder without agoraphobia, and insomnia. (Tr. 806.) Nurse Nicholson continued Taylor's Escitalopram and Clonazepam, increased her dose of Quetiapine, and recommended counseling. (*Id.*)

Taylor returned to Nurse Nicholson on July 23, 2014. (Tr. 810-814.) She reported no side effects from the medications, and indicated her "mood was pretty good even with all the stress." (Tr. 811.) Taylor did, however, complain of worsening panic symptoms, including an increased fear of choking. (*Id.*) On examination, Taylor's "affect was less blunted & congruent with mood & was less depressed." (*Id.*) Her speech was normal, her attitude was cooperative, and she exhibited good eye contact. (*Id.*) Taylor's thought process was logical and coherent, and she exhibited no concentration problems during the appointment. (*Id.*) Nurse Nicholson continued Taylor on her medications and encouraged her to attend counseling. (Tr. 812.)

On July 30, 2014, Taylor returned to Dr. Yang with complaints of lumbar spine which

she rated a 10 on a scale of 10.  (Tr. 850-853.)  Taylor reported constant throbbing pain in her right lower back radiating down her right lateral leg to her foot, and burning pain in her lateral hips.  (Tr. 851.)  On lumbar spine examination, Taylor was positive for pain and limited range of motion, but negative for muscle spasms and radicular pain.  (Tr. 852.)  Examination of Taylor's lower extremities was positive for tenderness to palpation bilaterally but otherwise normal.  (*Id.*)  Dr. Yang indicated "we discussed that we are reducing pain meds and that we need to reduce the Morphine to no more than 200 mg."  (Tr. 851.)  He decreased Taylor's MS Contin, prescribed a short course of Toradol, and ordered injections.  (Tr. 852.)  Taylor underwent bilateral sacroiliac joint injections on August 4, 2014, a lumbar caudal epidural injection on August 12, 2014, and a trochanteric bursa injection on August 21, 2014.  (Tr. 838-849.)

On September 5, 2014, Taylor reported "much decreased low back pain and bilateral hip pain with" recent steroid injections.  (Tr. 836.)  However, she complained of recent onset of "mid thoracic spine pain with whole chest tightness intermittent shooting pain from the thoracic spine to the anterior chest wall."  (*Id.*)  On examination, Taylor had moderate tenderness and tightness at the thoracic and lumbar/sacral paraspinals; decreased range of motion at the thoracic and lumbar/sacral paraspinals; negative straight leg raise test bilaterally; and negative ankle swelling.  (*Id.*)  Taylor was also "moderately tender at the anterior chest wall especially left sided lower part, increased pain with compression."  (*Id.*)  Dr. Yang noted Taylor's "chronic lumbar spine pain much improved, but the patient reported new onset mid thoracic spine pain and chest wall pain."  (Tr. 837.)  He continued Taylor's pain medications and prescribed one course of Medrol Dosepak for "acutely increased inflammation and pain."  (*Id.*)

On September 21, 2014, Taylor presented to Dr. Yang for treatment of pain in her

thoracic and lumbar spines. (Tr. 831-837.) She stated her pain "had moderately improved with one course of Medrol Dosepak which patient got at last office visit." (Tr. 832.) She indicated her current treatment plan was working moderately to control her pain, and allowed her to do her basic activities of daily living. (*Id*.) On examination, Taylor had moderate tenderness and tightness at the thoracic and lumbar/sacral paraspinals; decreased range of motion at the lumbar/sacral paraspinals; negative straight leg raise test bilaterally; and negative ankle swelling. (*Id*.) Dr.Yang noted "chronic thoracic and lumbar spine pain is improving but still significant." (Tr. 833.) He continued her MS Contin and Roxicodone, prescribed Diclofeac for "better inflammation and pain control," and discontinued her Voltaren Gel. (*Id*.)

Taylor returned to Dr. Geiger on January 6, 2015. (Tr. 828-830.) She stated her lumbar spine and right hip was "the same" since the last visit. (Tr. 829.) However, she reported a "shooting pain in her R leg down the front which is new over the last couple weeks," which was "mostly at night and lasts about ten minutes and subsides on its own." (*Id.*) Taylor indicated her medications were providing "some relief." (*Id*.) On lumbar spine examination, Taylor was positive for pain on palpation, limited range of motion, and radicular pain, but negative for muscle spasms. (*Id*.) Examination of Taylor's right lower extremity was positive for tenderness to palpation greater trochater, but otherwise normal. (*Id.*) Examination of Taylor's left lower extremity was normal. (*Id*.) Dr. Geiger ordered lumbar and right trochanteric bursa injections, which Taylor underwent on January 19 and 26, 2015. (Tr. 829, 818-827.)

On March 30, 2015, Taylor reported she was "not doing well." (Tr. 816.) Taylor stated her recent back injection "did help to relieve some of her constant [lower back pain] but she says that the pain in her left anterior leg has been more significant and disabling." (*Id*.) On

examination, Taylor was "in no acute pain" but was noted as "ambulating with difficulty." (*Id.*) Lumbar spinal examination was positive for pain on palpation, facet loading maneuvers, and radicular pain. (*Id.*) Examination of her right and left lower extremities was normal. (Tr. 816-817.) Dr. Geiger "informed [Taylor] that her morphine dose is too high and that we will need to decrease this dose." (Tr. 817.) However, he decided to wait until the next office visit "as her pain is very high right now," and increased her Neurontin dosage. (*Id.*)

## C.    State Agency Reports

### 1.    Physical Impairments

In August 2013, Taylor underwent a consultative physical examination with Yolanda Duncan, M.D. (Tr. 610-617.) Taylor reported the following physical impairments: herniated disc in her lower back, degenerative disc disease, arthritis in her right hip, tailbone cysts, and fibromyalgia. (Tr. 615.) She stated she could (1) stand for "about 10 minutes if she is able to lean then she must sit;" (2) walk less than a quarter of a block; (3) sit for about 30 minutes; (4) climb less than a flight of stairs; and (5) lift about 10 pounds. (*Id.*) Taylor also reported using a cane because her "right leg gives out." (*Id.*) At the time of the examination, Taylor was taking MS Contin, Dilaudid, Valium, Gabapentin, and Flexeril. (*Id.*)

On examination, Dr. Duncan noted Taylor "uses a pink cane for ambulation" and "has a slow and steady gait with both cane and without cane." (Tr. 616.) She had a full range of motion of all four extremities with normal pulses and no edema or cyanosis. (*Id.*) Dr. Duncan observed a slow but normal gait. (*Id.*) She stated Taylor's joints "appear to be clinically normal," with no sign of enlargement, thickening, effusion, swelling, tenderness, heat, redness, deformity, or instability. (*Id.*) Taylor's deep tendon reflexes were 2+ and equal bilaterally. (*Id.*)

Dr. Duncan also noted Taylor "did not have difficulty grasping or manipulating objects with either hand." (*Id.*) Manual muscle and range of motion testing was normal, with the exception of a reduced flexion of the dorsolumbar spine. (Tr. 611-614.)

Dr. Duncan assessed systemic lupus erythematosus ("SLE"), fibromyalgia, arthritis, herniated disc, "ribs that turn out of place," spondylosis, and degenerative disc disease. (Tr. 616.) She reached the following conclusions regarding Taylor's physical functional capabilities:

> Based on these findings, the patient would have difficulty with work-related physical activity such as walking more than a quarter of a block, walking more than a flight, sitting more than 30 minutes, and standing more than 10 minutes. Hearing and speech are normal. The patient should not have difficulty traveling or following commands. From my observation, should she receive benefits, she should be able to manage these in her own best interest.

(Tr. 616-617.)

In September 2013, state agency physician Anahi Ortiz, M.D., reviewed Taylor's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 98-99.) Dr. Ortiz adopted the "ALJ decision dated 6/1/12 per *Dennard Drummond*." (Tr. 99.) In that decision, the ALJ found Taylor had "the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can never climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs [and] occasionally balance, stoop, kneel, crouch, and crawl." (Tr. 73.)

In December 2013, state agency physician Maria Congbalay, M.D., reviewed Taylor's medical records and completed a Physical RFC Assessment. (Tr. 128-130.) Dr. Congbalay did not adopt the June 2012 ALJ decision pursuant to *Drummond* "due to new and material changes." (Tr. 130.) She concluded Taylor could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of 4 hours; and sit for a total of about 6 hours in

an 8 hour workday. (Tr. 129.) Dr. Congbalay further found Taylor had unlimited push/pull capacity and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl but never climb ladders, ropes, or scaffolds. (*Id.*) She opined Taylor had no manipulative or environmental limitations. (Tr. 129-130.) As explanation for her opinion, Dr. Congbalay stated: "Current exam shows slow but normal gait, [range of motion] of joints normal except for mild diminished flexion of the [dorsalumbar] spine." (Tr. 130.)

### 2. Mental Impairments

On August 26, 2013, Taylor underwent a consultative psychological examination with Joshua Magleby, Ph.D. (Tr. 603-609.) Taylor reported a psychiatric history of depression with symptoms beginning in 2005 or 2006. (Tr. 604.) She described her mental state as follows:

> Currently, she describes her mood as "sad" most of the time, since "the last 9-10 months on a daily basis" and currently due to "I don't know [why], but I think because I can't work anymore and I feel, like, I have no meaning now." Symptoms of depression include feeling "sad," crying "a lot," and "when I get upset I start having panic attacks," as well as feeling "worthless;" when queried further, she claims she has felt this way "since about a year and a half ago, when you go from working to being home every day, you feel like you have no purpose." Prior to about 1 year ago, her mood was "irritable" most of the time. Ms. Taylor does not report homicidal ideation, suicidal ideation [and she denies past attempts], mania, delusions, or psychosis. The claimant does not report consecutive days of hypomania. No psychiatric hospitalizations were reported.

(Tr. 605.) Taylor also reported poor appetite, sleep, and energy level. (*Id.*) However, she stated she was capable of dressing, bathing, taking care of her personal hygiene, and was "mostly capable" with independent activities of daily living. (*Id.*)

On mental status examination, Dr. Magleby noted Taylor was alerted and oriented to person, place, time and situation. (Tr. 605.) She had appropriate eye contact; her posture was normal and upright; and her gait was "normal and unencumbered." (*Id.*) Dr. Magleby noted

normal thought content and normal rate of speech, and described Taylor's ability to communicate and level of conversation as "average." (Tr. 606.) He found normal affect and normal psychomotor activity. (*Id*.) Dr. Magleby remarked that Taylor's mood was observed to be stable during the exam, and her depression symptoms were "mild to moderate." (*Id*.) She did not display any overt signs of anxiety, and did not report any "perceptual disturbances, such as clear clinical visual or auditory hallucinations." (*Id*.) Dr. Magleby estimated Taylor's intelligence as being in the low average range, and described her judgment, insight, and "consequential thinking" as fair. (Tr. 607.)

Dr. Magleby diagnosed unspecified depressive disorder with borderline and dependent traits. (*Id*.) He offered the following functional assessment:

1)      The claimant's ability to understand, remember, and carry out simple oral instructions is similar compared to other adults the same age based on this exam. On this exam the claimant has clearly shown the ability to follow the examiner's questions and directions, oral instructions on mental status, and provide simple appropriate responses. Comprehension seemed fair. Memory appeared somewhat impaired. The claimant's ability to follow more complex instructions or directions appeared to be fairly intact for age expectations.

2)      The claimant was not overly distracted on exam and seemed able to follow the procedures. The claimant's ability to maintain attention and concentration was fairly average compared to other adults the same age. Persistence and pace in providing personal information and responses to mental status appeared fairly normal compared to other adults the same age. The ability to perform a simple, repetitive task, based on mental status and history, appeared good. The ability to perform multi-step tasks appeared fairly average for age expectation.

3)      The claimant's ability to relate to others, such as peers, fellow workers, and/or supervisors, has been without significant incident, and her social relating during this evaluation was appropriate. This is supported by reports of past social adaptive behaviors, past relationships, and current relationship and social history.

4)      The claimant's ability to withstand the mental stress and pressures associated with day-to-day work activity appears somewhat impaired, compromised primarily by lack of sleep and depression. This is supported by claimant's current mental complaints on this exam, psychiatric history and estimated adaptive behaviors at this time.

(Tr. 608-609.)

In September 2013, state agency physician Karla Voyten, Ph.D., reviewed Taylor's medical records and completed a Psychiatric Review Technique ("PRT") and a Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 96-97, 99-101.) In the PRT, Dr. Voyten concluded Taylor was moderately restricted in activities of daily living, and had moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace. (Tr. 97.) In the Mental RFC Assessment, Dr. Voyten found Taylor had no understanding or memory limitations, and no social interaction limitations. (Tr. 99-100.) She did, however, conclude Taylor was moderately limited in her abilities to (1) carry out detailed instructions; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) respond appropriate to changes in the work setting; and (4) set realistic goals or make plans independently of others. (Tr. 100.) Dr. Voyten found Taylor retained the capacity to perform work which is not fast paced and does not require strict production demands, and which requires infrequent changes in a static work environment. (*Id*.) She further explained as follows:

I have looked at the findings of the ALJ decision dated 6/1/12 and find that the new file does have new and material changes. Clt has a [diagnosis] of borderline personality traits which was not part of the ALJ decision. Although clt does have some limitations, she does not appear limited in her cognition. She has an estimated low average intelligence, and her ability to [understand, remember, and follow] instructions does not appear to be impaired. She reports no issues with

getting along with others, and the records do not suggest that she would have problems relating to others. She does show slight problems with fast pace and with adaptation. Overall, clt's conditions appear to have improved since the ALJ. [sic]

(Tr. 100-101.)

In December 2013, state agency physician Deryck Richardson, Ph.D., reviewed Taylor's medical records and completed a PRT and a Mental RFC Assessment. (Tr. 127, 130-131.) Dr. Richardson reached the same conclusions as Dr. Voyten, above. (*Id.*)

**D.      Hearing Testimony**

During the June 5, 2015 hearing, Taylor testified to the following:

- She lives in a single-story house with her 23 year old son. (Tr. 37.) She has a driver's license but cannot drive while taking her medications. (Tr. 38.)

- She last worked in June 2010 as a cashier at Dollar Mart. (Tr. 38-39.) She worked there for about a year, but left when she felt she could no longer stand all day. (*Id.*) She also had difficulty scanning heavy items such as a twelve pack of beer. (*Id.*) Prior to her job at Dollar Mart, she worked for five years at a rubber extrusion facility. (Tr. 39.) In that position, she ran a rubber machine and packaged materials. (*Id.*) She stood most of the workday and was required to lift 25 pounds. (Tr. 39-40.)

- She also had past work experience at McDonald's. (Tr. 41.) She worked as a crew employee for one year and as a shift manager for three years. (*Id.*) In that position, she was required to stand most of the day and lifted up to 75 pounds. (*Id.*) Finally, in 2000, she worked for one year as a packager. (Tr. 42.) She stood for about six hours per day and was required to lift more than 25 pounds. (Tr. 43.)

- She can no longer work because of chronic pain in her lower back, hips, and legs. (Tr. 44, 57.) She experiences leg stiffness in the morning that makes it very difficult for her to get out bed. (Tr. 44.) Her leg pain is the worst and it often feels like "there's snakes wrapped around her legs squeezing." (Tr. 57-58.) On an average day, her pain is between a 7 and 8 on a scale of 10. (Tr. 58.) She has "bad days" three to four times per week when the pain is even worse. (*Id.*) On these days, she has increased pain for about an hour to the point where she cannot function. (*Id.*) Due to her pain, it is difficult for her to walk long distances or sit. (Tr. 45.)

- She has been treated with pain medication, injections, physical therapy, and a TENS unit. (Tr. 50, 55-57.) She had been taking morphine for the past eight years. (Tr. 56-57.) She currently takes morphine, Dilaudid, Flexeril, Neurontin, and Klonopin. (Tr. 50-51.) Her doctors were planning on weaning her from morphine and transitioning her to Opana. (*Id.*) She experiences side effects from her medications, particularly drowsiness. (Tr. 45, 56.)

- Neither physical therapy nor the TENS unit have been effective in relieving her pain. (Tr. 55.) Injections are effective for about three weeks. (*Id.*) She uses a cane because she fell three times in the previous six weeks. (*Id.*) She uses a cane or motorized cart at the grocery store. (*Id.*) She was referred to a surgeon, who told her surgery "would not work" for her. (Tr. 56.)

- She also suffers from numbness in her hands and fingers. (Tr. 45.) Her hands become numb "a couple days per week" and "get really cold and then just go numb for days." (Tr. 48-49.) She has experienced this problem since 2007. (Tr. 48.) She can button clothing and tie her shoes except when her fingers are numb, which happens "several times per week." (Tr. 58-59.) She is constantly dropping things, such as glasses of water. (Tr. 47.)

- She can stand for about 10 minutes at a time. (Tr. 47.) She can only walk short distances. (Tr. 45-46.) She can pick up a gallon of milk but could not do so repeatedly throughout the day because of her hand and finger numbness. (Tr. 47.)

- Due to difficulty urinating, she has to self-catheterize at least twice per day. (Tr. 54.) It takes about 15 minutes and is painful. (*Id.*) The doctors have no explanation for her condition. (*Id.*) It has been ongoing for a year and a half. (*Id.*)

- She also suffers from mental health problems. (Tr. 51.) She feels depressed and has "really bad panic attacks." (*Id.*) She feels nervous around strangers and has panic attacks at least once per day. (Tr. 53.) Sometimes she does not get out of bed because of her depression. (Tr. 52-53.) It is "mentally hard" for her to get out of bed at least four days per week. (Tr. 52.) She has difficulty concentrating and takes Seroquel because she was hearing voices. (Tr. 52, 59.) Lately she has been "in a mood to break things" around the house for no reason. (Tr. 51, 59.) She has lost weight due to her depression, and was 5' and only 104 pounds at the time of the hearing. (Tr. 53-54.)

- She goes to the grocery store once every two weeks. (Tr. 51.) She does the dishes and puts her clothes in the washer and dryer. (*Id.*) Her son does the cooking and the yard work, carries the laundry basket, and pays the bills. (Tr.

51-52.)

The VE testified Taylor had past work as a hand packager (medium, SVP 2); cashier/checker (light, SVP 3); fast food manager (SVP 5, performed as medium); fast food worker (SVP 2, performed as medium); and general laborer (SVP 2, medium). (Tr. 60.) The ALJ then posed the following hypothetical question:

> Hypothetical number one, assume, please, an individual of the claimant's age, education and work experience, able to work at the sedentary exertional level. Can never climb ladders, ropes or scaffolds, but can occasionally climb ramps and stairs. Can occasionally balance, stoop, kneel, crouch, and crawl. Can understand, remember, and carry out simple and detailed, but not complex, instructions. Requires a relatively static, low-stress work place with few changes in work settings or work processes and without strict quotas or fast paced high production demands. Cannot have more than infrequent, superficial contact with the public, but can occasionally interact with coworkers. Can the individual described in hypothetical number one perform any of the claimant's past work?

(Tr. 60-61.)

The VE testified the hypothetical individual would not be able to perform Taylor's past work, but would be able to perform other representative jobs in the economy, such as addresser (SVP 2, sedentary); document preparer (SVP 2, sedentary); and ticket taker (SVP 2, sedentary). (Tr. 61.)

The ALJ then asked a second hypothetical that was the same as the first, but added the limitation that "the hypothetical individual cannot be around unprotected heights or moving machinery and cannot engage in commercial driving." (Tr. 61.) The VE testified the hypothetical individual would be able to perform the previously identified jobs of addresser, document preparer, and ticket taker. (Tr. 61-62.)

The ALJ then asked a third hypothetical as following: "add to number two, which, of course, was adding to number one, the following additional restriction, frequent fingering and

feeling of objects." (Tr. 62.) The VE testified the hypothetical individual would not be able to perform the ticket taker job, but would be able to perform the previously identified jobs of addresser and document preparer as well as the job of polisher, eyeglass frames (SVP 2, sedentary). (*Id*.) The ALJ followed with a fourth hypothetical that "adds to number three and that is that the individual would be absent two or more days per month." (*Id*.) The VE testified there would be no jobs for such an individual. (*Id*.)

Taylor's counsel asked the VE the following hypothetical:

Ma'am, if we were to add to the Judge's first hypothetical the following additions, the following restrictions, the lift max bilaterally would be five pounds. The hypothetical worker would require a sit-stand opinion. She'd have to stand up every 30 minutes for 10 minutes duration, remaining on task. She could only occasionally handle, finger, feel bilaterally. And then, the other restrictions laid out by the Judge. Would that hypothetical worker be able to do her past work?

(Tr. 62-63.) The VE testified the hypothetical individual would not be able to perform her past work and, further, would not be able to perform any other jobs. (Tr. 63.)

Upon further questioning from Taylor's counsel, the VE testified that there is typically a probationary period for unskilled work that lasts approximately 90 days. (*Id*.) The VE explained that, during the probationary period, employer "tolerance is low for absenteeism." (*Id*.) Taylor's counsel then asked the following hypothetical:

If we were to assume a hypothetical worker of the claimant's age, education and work history, limited to sedentary unskilled employment, who were to simply be off task 15% of the work shift, would that hypothetical worker be able to maintain employment?

(*Id*.) The VE testified such a hypothetical worker would not be able to maintain employment and explained that, based on her work experience and training, employer tolerance for off task time in an unskilled environment is approximately 10%. (Tr. 64.)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Taylor was insured on her alleged disability onset date, June 2, 2012, and remained insured through September 30, 2015, her date last insured ("DLI"). (Tr. 19.) Therefore, in order to be entitled to POD and DIB, Taylor must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2015.

2. The claimant has not engaged in substantial gainful activity since June 2, 2012, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.)

3. The claimant has the following severe impairments: degenerative disc disease, depressive disorder and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 419.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. She can occasionally balance, stoop, kneel, crouch and crawl. The claimant can understand, remember, and carry out simple and detailed, but not complex instructions. She requires a relatively static, low stress workplace with few production demands. The claimant should not have more than infrequent superficial contact with the public, but can occasionally interact with co-workers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May ** 1970 and was 42 years old, which is defined as a younger individual aged 45 -49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 2, 2012 through the date of the decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-28.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d

at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011), *report and recommendation adopted by* 2011 WL 6122758 (S.D. Ohio Dec. 8, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010), *report and recommendation adopted by*, 2010 WL 2929550 (N.D. Ohio July 27, 2010).

## VI. ANALYSIS

***Drummond***

28

In her first assignment of error, Taylor argues "the ALJ erroneously determined there was no change in [her] condition since the prior ALJ's decision" and improperly adopted the prior ALJ's RFC pursuant to *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997). (Doc. No. 15 at 16.) Taylor maintains "the record demonstrates that [her] impairments have worsened since the prior ALJ's decision, with the facts showing new mental illness diagnosis, new medications, and new treatment." (*Id.* at 17.) With regard to her mental impairments, Taylor emphasizes recent mental health records demonstrating she was newly diagnosed with bipolar affective disorder and prescribed an antipsychotic medication. (*Id.*) With regard to her physical impairments, Taylor argues the record shows her condition worsened, citing evidence of a radicular component to her ongoing pain, "vibrating numbness" in her left pelvis and thigh, repeated injections and adjustments to her medication, and the new complaint of difficulty urinating. (*Id.* at 17-18.) Finally, Taylor asserts the ALJ erred in according little weight to Dr. Duncan's opinion and relying instead on state agency physician opinions rendered "without the benefits of the complete treatment record documenting [her] worsening condition." (*Id.* at 18.)

The Commissioner asserts Taylor failed to carry her burden of demonstrating a new or worsening condition, either with regard to her physical or mental impairments. (Doc. No. 17.) She argues the ALJ reasonably concluded that objective medical findings remained consistent with her previous case, as did Taylor's course of treatment. The Commissioner further asserts the ALJ properly discounted Dr. Duncan's opinion as inconsistent with her own examination findings. Thus, the Commissioner argues the ALJ did not err in adopting the highly restrictive RFC set forth in the previous ALJ decision.

In *Drummond* , the Sixth Circuit held that "[w]hen the Commissioner has made a final

29

decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this

determination absent changed circumstances." *Drummond*, 126 F.3d at 842 (relying on *Senters*

*v. Sec'y of Health & Human Servs.*, 1992 WL 78102 (6th Cir. Apr. 17, 1991) (per curiam). *See*

*also Dennard v. Sec'y of Health & Human Servs.*, 907 F.2d 598 (6th Cir.1990) (per curiam);

*Blankenship v. Comm'r of Soc. Sec.*, 624 Fed. Appx. 419, 425 (6th Cir. Aug. 26, 2015).  In that

case, Drummond's initial claim for SSI was denied when an ALJ found that Drummond retained

a RFC for sedentary work.  *Drummond*, 126 F.3d. at 838.  When Drummond later re-filed her

disability claim, a second ALJ found that Drummond retained a RFC suitable for medium-level

work—unlike the sedentary RFC finding of the first ALJ—and denied the re-filed claim.  *Id*. at

839.  After explaining that "*[r]es judicata* applies in an administrative law context following a

trial type hearing," the Sixth Circuit held that the second ALJ was bound to the sedentary RFC

determination of the first ALJ because there was no new or additional evidence of an

improvement in Drummond's condition.  *Id*. at 841–842.  "Just as a social security claimant is

barred from relitigating an issue that has been previously determined, so is the Commissioner."

*Id*.

   In response to *Drummond*, the Social Security Administration promulgated

Acquiescence Ruling 98–4(6). The Administration explained:

> This Ruling applies only to disability findings in cases involving claimants who
> reside in Kentucky, Michigan, Ohio, or Tennessee at the time of the determination
> or decision on the subsequent claim at the initial, reconsideration, ALJ hearing or
> Appeals Council level. It applies only to a finding of a claimant's residual
> functional capacity or other finding required at a step in the sequential evaluation
> process for determining disability provided under 20 CFR 404.1520, 416.920 or
> 416.924, as appropriate, which was made in a final decision by an ALJ or the
> Appeals Council on a prior disability claim.
>
> When adjudicating a subsequent disability claim with an unadjudicated period

arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98–4(6) (S.S.A.), 1998 WL 283902, at *3 (1998) (emphasis added) (footnote omitted).

As the Sixth Circuit recently explained, "[r]ead together, *Drummond* and Acquiescence Ruling 98–4(6) clearly establish that a subsequent ALJ is bound by the legal and factual findings of a prior ALJ unless the claimant presents new and material evidence that there has been either a change in the law or a change in the claimant's condition." *Blankenship*, 624 Fed. Appx. at 425. "New" evidence is evidence " 'not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding.' " *Schmiedebusch v. Comm'r of Soc. Sec.*, 2013 WL 5749156 at * 9 (6th Cir. Oct. 24, 2013) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)). With regard to materiality, a claimant "must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711 (6th Cir.1988). *See also Schiedebusch*, 2013 WL 5749156 at * 9.

The Court will address Taylor's arguments regarding the ALJ's application of *Drummond* in the context of her physical and mental impairments separately, below.

### *Physical Impairments*

Taylor filed her first application for POD, DIB, and SSI in October 2010, alleging disability since June 2010. (Tr. 69.) In a written decision dated June 1, 2012, an ALJ considered the medical evidence regarding Taylor's impairments. (Tr. 69-83.) Based on this evidence, as

well as the opinion evidence, the ALJ determined Taylor had the following severe impairments:

lumbar spondylosis, lumbar degenerative disc disease, fibromyalgia, displaced lumbar disc,

depression, anxiety disorder, chronic pain syndrome, and knee osteoarthritis.  (Tr. 71.)

With regard to Taylor's physical impairments, the ALJ determined at step three that

Taylor did not meet or equal the criteria for Listings 1.02 or 1.04.  (Tr. 72.)  At step four, the

ALJ summarized Taylor's physical symptoms and self-reported limitations as follows:

> The claimant alleges chronic pain from fibromyalgia.  She stated that she can
> only stand for a short period of time and cannot sit upright.  She stated that the
> pain is so bad when she is standing for hours that she has to keep adjusting
> herself.  She stated that she has pain from her neck to her tailbone and that her
> pain is in her low back and right hip and thigh is the worst.  She stated that she
> has constant pressure and burning at the tailbone and numbness and vibration in
> the legs and that her knees give out.  She uses a cane when her pain is very bad
> and when she has to walk at the grocery store.  She estimated that she can stand
> 10 minutes before she starts getting sharp pain in her hips and low back and
> starts to feel light headed.  She estimated that she can sit for an hour.  She
> reported problems with bending, stooping, and squatting.  She stated that the
> tips of her fingers get cold and numb. . . . She stated that if she does not take her
> medications, she has muscle spasms.

(Tr. 74.)  He found, however, that Taylor's statements concerning the intensity, persistence, and

limiting effects of these symptoms were "not credible" to the extent they were inconsistent with

the RFC.  (*Id*.)  In support of this conclusion, the ALJ noted (1) MRIs of Taylor's lumbar spine

in July and September 2010 showing only minimal degenerative disc disease and some disc

protusion but no stenosis; and (2) an MRI of her thoracic spine from September 2010 showing

multilevel disc bulges with mild to moderate spinal canal stenosis.  (*Id*.)  The ALJ also discussed

numerous physical examination findings in the record.  While the ALJ acknowledged these

examinations documented some pain, tenderness, and decreased range of motion, the ALJ

emphasized the many normal examination findings in Taylor's treatment records, including

negative straight leg raise, full to near-full muscle strength, normal reflexes and sensation, and negative ankle swelling.  (Tr. 75.)  The ALJ also noted Taylor reported relief from both injections and pain medication and, further, that she "consistently reported that she is able to do [activities of daily living] on her treatment plan."  (Tr. 75-76.)

With regard to the opinion evidence, the ALJ concluded as follows: "The State Agency medical consultant opined that the claimant can perform light work with postural limitations (6A; 7A).  This opinion is given little weight as the claimant is given the benefit of the doubt as to limitations with standing and is, therefore, limited to sedentary work.  The record does not support limitations in gross and fine manipulation."  (Tr. 77.)  The ALJ assessed the following physical restrictions in the RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs.  She can occasionally balance, stoop, kneel, crouch and crawl.

(Tr. 73.)  Based on the testimony of the VE, the ALJ concluded Taylor was able to perform representative jobs in the economy such as bench hand, table worker, and final assembler.  (Tr. 78.)  Accordingly, the ALJ determined Taylor "has not been under a disability, as defined in the Social Security Act, from June 28, 2010 through the date of this decision."  (*Id.*)  The ALJ's decision was upheld by the Appeals Council, after which Taylor appealed to this Court.  In an Opinion & Order dated October 15, 2014, Magistrate Judge George Limbert found substantial evidence supported the ALJ's decision and affirmed.  *See Taylor v. Colvin*, Case No. 1:14CV338 (N.D. Ohio) (Doc. No. 20.)

Taylor filed her second application for POD, DIB, and SSI on June 20, 2013, alleging a

disability onset date of June 2, 2012 (one day after the previous ALJ decision). (Tr. 19.) At the

outset, the second ALJ acknowledged the previous ALJ decision and found as follows:

> In accord with the holding in *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997), where a final hearing decision on a prior disability claim contains the findings of a claimant's residual functional capacity, the Administration may not make a different finding in the adjudication of a subsequent disability claim (with an unadjudicated period arising under the same title of the Act as the prior claim), unless there is new and material evidence or a change in the circumstance that provide a basis for a different finding. Unless the medical evidence demonstrates a change in the claimant's [sic], I am bound by the findings of the previous Administrative Law Judge regarding residual functional capacity pursuant to *Drummond*. **In this case, there is no new and material evidence pertaining to the unadjudicated period that would change the prior residual functional capacity. Consequently, I cannot find that the claimant's condition has changed since the prior Administrative Law Judge's decision. Therefore, I adopt the residual functional capacity used in the prior opinion.**

(Tr. 20) (emphasis added). The ALJ then found Taylor suffered from the severe impairments of

degenerative disc disease, depressive disorder, and anxiety disorder. (Tr. 22.) The ALJ

determined Taylor's impairments, considered singly and in combination, did not meet or equal a

Listing, including Listing 1.04. (Tr. 22-23.)

The decision then goes on to discuss the medical evidence regarding Taylor's physical

and mental impairments. With regard to Taylor's physical impairments, the ALJ analyzed

Taylor's self-reported symptoms and limitations, and the medical evidence as follows:

> With respect to the nature of the claimant's symptoms, precipitating and aggravating factors, the medications taken and any side-effects, and other measures used to relieve the symptoms, the claimant testified that her worse problem is her chronic pain. She has a driver's license but does not drive while on her medication. She drives to the pharmacy. She cannot work now because it is difficult for her to walk in the morning. She has leg pain and stiffness. She cannot walk long distances or sit because of cysts on her tailbones. She can walk short distances and stand for short periods, maybe 5 to 10 minutes. She drops things and has numbness in her hands. She goes to the grocery store, washes dishes and clothes. Her son may help her with

cooking and other chores.

* * *

The record reveals that, as in the previous case, the claimant has mild degenerative disc disease at L4-L5 and L5-Sl with small disc herniation at the L5-Sl level, with no central canal stenosis or neural foraminal narrowing. In addition, she has multilevel thoracic disk herniation with no significant central canal stenosis (Exhibit B2F). The claimant received routine lumbar injections to help with pain, which she reported helps her low back pain (Exhibit B7F/ 14). In addition, the claimant took narcotic pain medication for pain control (Exhibit B7F/15). There is no evidence of a disorder effecting her ability to do fine fingering and gross handling.

On August 29, 2013, the claimant attended a consultative physical examination connected to her application for benefits. The claimant reported that she has a herniated disc in her lower back, degenerative disc disease, and arthritis in the right hip, which cause pain. She reported that she can lift about 10 pounds, sit for 30 minutes, and walk a quarter of a block. On examination, the claimant ambulated with a cane; she had a slow and steady gait with and without the cane. She had full range of motion in all planes. She could heel-toe walk bilaterally. Her joints were normal with no sign of abnormalities. She did not have difficulty with grasping or manipulating objects. The examiner concluded that the claimant had difficulty with walking more than a quarter of a block, walking more than a flight of stairs, sitting more than 30 minutes, and standing more than 10 minutes (Exhibit B6F). I give little weight to the examiner's opinion as it is based mainly on the claimant's subjective complaints of her limitations and not the objective medical examination. The claimant has full range of motion in all planes and her gait is steady, but slow, with or without the ambulatory aid. Her joints are normal, there are no indications of abnormalities. She can occasionally climb stairs and performing the standing, walking and sitting requirements of sedentary level exertional activity.

Nevertheless, there are no abnormal findings on x-ray views of the hip. Doctors observed minimal degenerative changes, but no acute fracture, dislocation or effusion (Exhibit B8F/ 1). The claimant continued with treatment through a pain management specialist, receiving medication and injections. In November 2013, the claimant reported that her treatment modality allowed her to complete activities of daily living and be more physically active (Exhibit B 1lF/62). She remained stable through March 2015; surgery is not indicated (Exhibit B11F).

(Tr. 24-25.) As to the opinion evidence, the ALJ explained that "the DDS found that there was

no new and material evidence and adopted the prior ALJ opinion as to the claimant's current residual functional capacity. I concur with that finding; there is no new and material evidence in the file that warrants a change in the prior ALJ decision regarding the residual functional capacity." (Tr. 26.)

The Court finds the ALJ's determination that there was no new and material evidence demonstrating a worsening of Taylor's physical impairments is supported by substantial evidence. As the ALJ noted, the objective medical evidence, physical examination findings, and Taylor's treatment regimen remained consistent with her previous application. Both the 2010 and 2012 MRIs of Taylor's lumbar and thoracic spine showed some disc herniation but contained mostly mild findings. Specifically, the 2010 lumbar MRIs discussed by the previous ALJ showed only minimal degenerative disc disease with some disc protrusion but no stenosis; while the September 2012 lumbar MRI showed mild degenerative disc disease and a small disc herniation with no stenosis or significant foraminal narrowing. (Tr. 74, 591, 707.) Additionally, the MRIs of Taylor's thoracic spine from 2010 and 2012 both show multi-level disc herniation but no significant stenosis. (Tr. 74, 593, 707.) Taylor's right hip x-ray from September 2013 showed only "minimal degenerative changes." (Tr. 722.) Taylor does not argue or explain how this objective medical evidence supports her claim of worsening lumbar and thoracic pain.

Similarly, the physical examination findings before the instant ALJ document Taylor's continued complaints of chronic pain in her lumbar and thoracic spines, right hip, and legs; vibrating numbness in her legs and knees; and numbness in her hands and fingers. These pain complaints were acknowledged and discussed by both the previous and the instant ALJ. Like the treatment records before the previous ALJ, Taylor's physical examination findings consistently

36

showed pain, tenderness and limited range of motion but also contained many normal findings. For example, during the relevant time period herein, Dr. Yang and Dr. Geiger most often noted Taylor was in no acute distress, could ambulate without difficulty, and showed full to near full muscle strength, normal reflexes and sensation, and no swelling in her lower extremities. (Tr. 706-707, 670-671, 663-664, 647-648, 635-636, 852, 829.) Moreover, while there are some exceptions (Tr. 659, 635), Taylor frequently reported that her current treatment plan was working to control her pain and allowing her to do her basic activities of daily living. (Tr. 702, 684, 670, 667, 663, 876, 860, 832.)

Taylor nonetheless argues the frequent adjustments to her medications indicate a worsening of her physical impairments. The Court finds this argument to be without merit. As the Commissioner correctly notes, Taylor's medication adjustments often involved increasing one medication while decreasing another, or replacing one medication with a different one. The Court does not find such adjustments to be necessarily indicative of a deterioration in Taylor's condition. Morever, the record reflects that, throughout this time period, Taylor's pain medication specialists were working to either wean her off many of her medications and/or reduce the dosages. (Tr. 668, 817, 851.) Additionally, the ALJ correctly noted that Taylor often reported experiencing some relief from her injections and pain medications. (Tr. 710, 706, 647, 635, 631, 876, 836, 829, 816.)

The Court also rejects Taylor's argument that *Drummond* is inapplicable because of her urination problems. The only treatment records relating to this particular issue are from November 2012. At that time, Taylor was diagnosed with a urinary tract infection and prescribed antibiotics. (Tr. 768, 776.) While Taylor testified at the hearing that she continued to experience

difficulty urinating and had to self-catheterize during the day, there is no indication in the record that she sought any further medical treatment for this condition. Likewise, Taylor does not direct this Court's attention to any treating physician opinion indicating her urination issues resulted in physical functional limitations beyond those set forth in the RFC.[3]

Taylor next argues, summarily and with little explanation, that the ALJ erred in according little weight to the opinion of consultative examiner Dr. Duncan that Taylor would have difficulty walking more than a quarter of a block, climbing more than a flight of stairs, sitting more than 30 minutes, and standing more than 10 minutes. (Tr. 616-617.) The ALJ rejected this opinion because it was "based mainly on the claimant's subjective complaints of her limitations and not the objective medical examination." (Tr. 25.) In support of this conclusion, the ALJ noted Dr. Duncan's examination findings that Taylor had full range of motion in all planes, a steady but slow gait (with or without ambulatory aid), and normal joints. (*Id.*)

In formulating the RFC, ALJs "are not required to adopt any prior administrative medical findings" made by State agency medical or psychological consultants, or other program physicians or psychologists. 20 C.F.R. § 404.1513a(b)(1). *See also* 20 C.F.R § 404.1527(e). Because "our Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation," ALJs must consider their findings and opinions. *Id.* When doing so, an ALJ will evaluate the findings using the relevant factors in §§

_____

[3]The Court also rejects Taylor's argument that her "vibrating numbness," hand and finger numbness, and radicular pain are new conditions. The previous ALJ decision expressly recognized evidence regarding Taylor's complaints of "vibrations in her legs" and hand and finger numbness. (Tr. 74.) Moreover, as the Commissioner notes, the record before the previous ALJ indicates Taylor was diagnosed with lumbosacral radiculopathy in September 2011, well prior to the previous June 2012 ALJ decision. (Tr. 321, 324.)

404.1520b, 404.1520c and 404.1527, such as the consultant's medical specialty and expertises, the supporting evidence in the case record, consistency of the consultant's opinion with evidence from other sources in the record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions. 20 C.F.R. § 404.1513a(b)(2). Finally, an ALJ must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant unless a treating physician's opinion has been accorded controlling weight. *See* 20 C.F.R § 404.1527(e).

The Court finds the ALJ properly discounted Dr. Duncan's extreme walking, standing, and sitting restrictions. As set forth above, the ALJ acknowledged Dr. Duncan's opinion and articulated several reasons for discounting it. The ALJ's reasons are supported by substantial evidence. As the ALJ corrected noted, Dr. Duncan's physical examination findings are not consistent with her opinion of highly restrictive physical functional limitations. On examination, Dr. Duncan noted Taylor had (1) a full range of motion of all four extremities with normal pulses and no edema or cyanosis; (2) a slow and steady gait both with and without her cane; (3) normal joints with no sign of enlargement, thickening, effusion, swelling, tenderness, or instability; (4) normal deep tendon reflexes; and (5) normal manual muscle and range of motion testing, with the sole exception of reduced flexion of the dorsolumbar spine. (Tr. 611-614, 616.) The ALJ reasonably concluded these findings were inconsistent with Dr. Duncan's opinion that Taylor would have difficulty walking more than a quarter of a block, climbing more than a flight of stairs, sitting more than 30 minutes, and standing more than 10 minutes.

Finally, it was not unreasonable for the ALJ to accept the opinions of state agency physicians, Drs. Ortiz and Congbalay, over the opinion of Dr. Duncan. It is true that Dr. Ortiz's

September 2013 opinion and Dr. Congbalay's December 2013 opinion were rendered well before the ALJ's decision, which was issued June 25, 2015.  However, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record."  *Helm v. Comm'r of Soc. Sec.*, 2011 WL 13918 at * 4 (6th Cir. Jan. 4, 2011).  Rather, the Sixth Circuit requires only "some indication that the ALJ at least considered [later treatment records] before giving greater weight to an opinion that is not 'based on a review of a complete case record.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (quoting *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007)).  *See also Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 632 (6th Cir. 2016) (stating *Blakley* requires "only that before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give 'some indication' that he 'at least considered' that the source did not review the entire record.")

Here, the ALJ addressed evidence post-dating Dr. Ortiz's and Dr. Congbalay's opinions, finding Taylor "remained stable through March 2015; surgery is not indicated (Exhibit B11F)" (Tr. 25.)  While it might have been preferable for the ALJ to more thoroughly discuss Taylor's treatment records post-dating the state agency physicians' opinions, it is clear the ALJ reviewed and considered these records in his step four analysis.  Indeed, the "Exhibit B11F" referenced in the ALJ's decision consists of Taylor's records from the time period post-dating the state agency physicians' opinions; i.e. from December 2013 through March 2015.  (Tr. 32.)  Taylor has not demonstrated the ALJ's assessment of the evidence post-dating the state agency physician opinions is unreasonable or unsupported by substantial evidence.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not err

in determining there was no new or material evidence pertaining to Taylor's physical impairments during the time period at issue that would necessitate a change from the prior ALJ's RFC.

### Mental Impairments

Taylor next argues the ALJ erred in determining there was no new and material evidence regarding her mental impairments. As noted *supra*, the previous ALJ determined Taylor suffered from the severe mental impairments of depression and anxiety disorder. (Tr. 71.) The ALJ determined at step three that Taylor did not meet or equal the criteria of Listings 12.04 and 12.06, finding she was mildly restricted in her activities of daily living and had moderate difficulties in social functioning and concentration, persistence, and pace. (Tr. 72.)

At step four, the previous ALJ acknowledged Taylor's testimony that she "has depression and panic attacks which causes heaviness in the chest and last about five minutes." (Tr. 74.) The ALJ discussed medical evidence indicating Taylor had received medication for her psychological conditions, but noted she "has not had any type of counseling or therapy." (Tr. 76.) The ALJ addressed the opinion of consultative examiner William E. Mohler, M.A., that Taylor had (1) no impairment in her ability to understand, remember, and follow instructions, or maintain attention, concentration, persistence, and pace; (2) moderate impairment in her ability to relate to others; and (3) marked impairment in her ability to withstand the stress and pressures associated with day to day work activity. (*Id.*) The previous ALJ accorded this opinion significant weight, but noted as follows: "the claimant has not sought counseling or other mental health treatment to assist with her ability to handle stress. The evidence does not demonstrate that she would not be able to handle a static, low stress work environment with few changes and

no strict quotas. Further, while she reported that she first took Ativan for depression in 2006, she was able to continue working for several years." (*Id.*)

In the RFC, the previous ALJ limited Taylor as follows: "The claimant can understand, remember and carry out simple and detailed, but not complex instructions. She requires a relatively static, low stress workplace with few changes in work settings or work processes and without strict quotas or fast-paced high production demands. The claimant should not have more than infrequent superficial contact with the public, but can occasionally interact with coworkers." (Tr. 73.)

In his June 2015 decision, the instant ALJ also found Taylor suffered from the severe impairments of depressive disorder and anxiety disorder. (Tr. 22.) He agreed with the previous ALJ that Taylor did not meet or equal the criteria of Listings 12.04 and 12.06, similarly finding she was mildly restricted in her activities of daily living and had moderate difficulties in social functioning and concentration, persistence, and pace. (Tr. 23.) At step four, the instant ALJ acknowledged evidence that Taylor "has panic attacks[,] feels depressed [and] may hear voices" noting she "last saw a counselor two weeks prior to the hearing." (Tr. 24-25.) The ALJ evaluated the medical evidence regarding Taylor's mental impairments as follows:

> As far as her mental impairments are concerned, the claimant received treatment through HealthSpan with a nurse practitioner. However, she did not resume treatment until May 2014 and the practitioner noted that she attended appointments inconsistently and could not tolerate medications. At that time, the claimant reported having panic attacks every week and more anxiety and depression since her son's incarceration. Nevertheless, the practitioner observed that she had no difficulty concentrating and had normal motor behavior, thought processes, and memory. Her attitude was cooperative and she had good hygiene and good eye contact. The practitioner prescribed medication to help control the claimant's symptoms and encouraged her to follow through with counseling (Exhibit B10F). However, the record reveals that she only attended two

42

appointments; there is no record of treatment after July 2014.

(Tr. 25-26.)

The ALJ then addressed Dr. Magleby's August 2013 psychological consultative examination. (Tr. 26.) As noted above, Dr. Magleby concluded Taylor could (1) understand, remember, and carry out simple and complex instructions; (2) maintain attention, concentration and pace for simple and multi-step tasks; and (3) relate appropriately to others. (Tr. 608-609.) He found, however, that her ability to withstand the mental stress and pressures associated with day to day work activity was "somewhat impaired, compromised primarily by lack of sleep and depression." (*Id*.) The ALJ weighed this opinion as follows:

> I give the opinion significant weight as it is consistent with the overall record. The claimant alleges she has panic attacks and multiple depression symptoms, but she was not on any medication for depression or anxiety or involved with treatment at the time of the assessment. She currently takes medication but has a history of noncompliance or lackadaisical approach to treatment and counseling. Nevertheless, she has not presented any new and material evidence that demonstrates she would not still be able to handle a static, low stress work environment with few changes and no strict quotas, allowing for superficial interaction with others.

(Tr. 26.) Pursuant to *Drummond*, the ALJ adopted the same mental functional limitations in the RFC as in the previous ALJ decision. (Tr. 24.)

The Court finds the ALJ's determination that there was no new and material evidence demonstrating a worsening of Taylor's mental impairments is supported by substantial evidence. Notwithstanding Taylor's argument to the contrary, the ALJ thoroughly discussed the medical evidence regarding Taylor's mental impairments during the relevant time period. As set forth above, the ALJ correctly noted Taylor did not resume mental health counseling until May 2014, at which time Nurse Nicholson noted Taylor attended appointments inconsistently. (Tr. 802-808.)

43

The record before the ALJ indicated Taylor attended only one other mental health appointment during the relevant time period, in July 2014.  (Tr. 810-814.)  At that appointment, Taylor's mood was less depressed; her speech was normal; her attitude was cooperative; her thought process was logical and coherent; and she exhibited no concentration problems.  (*Id.*)  The ALJ also fully considered Dr. Magleby's consultative examination findings, most of which were normal, as well as his opinion that Taylor showed no impairment in mental functioning with the exception of "some" impairment in withstanding stress.  In light of this evidence, Taylor has not shown the ALJ erred in adopting the significant mental restrictions in the previous ALJ's RFC.  (Tr. 24.)

Taylor asserts remand is required, however, because, during the relevant time period, she was newly diagnosed with bipolar affective disorder and prescribed an anti-psychotic medication.  The Court is not persuaded by this argument.  While Nurse Nicholson did diagnose bipolar affective disorder and prescribe an anti-psychotic medication in May 2014, Taylor fails to demonstrate these developments resulted in functional limitations greater than that set forth in the RFC.  It is well-established that "disability is determined by functional limitations imposed by a condition, not the mere diagnosis of it."  *Hill v. Comm'r of Soc. Sec.*, 560 Fed. Appx. 547, 551 (6th Cir. 2014) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1998)).  *See also Spears v. Comm'r of Soc. Sec.,* 2016 WL 8458372 at * 6 (N.D. Ohio Dec. 20, 2016) ("Importantly, however, it is not a diagnosis that creates disability but rather 'the functional limitations imposed by a condition'") (citing *Hill*, 560 Fed. Appx. at 551); *Baker v. Colvin*, 2016 WL 4128435 at * 9 (N.D. Ohio Aug. 3, 2016) (stating "a diagnosis alone does not indicate the functional limitations caused by the condition.") (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151

(6th Cir. 1990)); *Hicks v. Comm'r of Soc. Sec.*, 2014 WL 4748356 at * 5 (S.D. Ohio Sept. 23, 2014) ("Even assuming the record establishes that Plaintiff was in fact diagnosed with radial nerve palsy or peripheral neuropathy, a mere diagnosis or catalogue of symptoms does not indicate functional limitations caused by the impairment")  Taylor does not identify any additional mental functional limitations that she believes should have been included in the RFC as a result of her diagnosis with bipolar affective disorder.  Nor has she directed this Court's attention to any medical or opinion evidence in the record indicating greater restrictions are necessary.

Taylor also argues the ALJ erred in relying on the opinions of state agency psychologists Drs. Voyten and Richardson because they "were not able to review [her] mental health treatment records and were unaware that she was prescribed an antipsychotic for bipolar disorder."  (Doc. No. 15 at 17.)  However, as noted *supra*, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record."  *Helm*, 2011 WL 13918 at * 4.  Rather, all that is required is "some indication that the ALJ at least considered [later treatment records] before giving greater weight to an opinion that is not 'based on a review of a complete case record.'"  *Blakley*, 581 F.3d at 409.  *See also Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. at 632.  Here, the ALJ thoroughly considered Nurse Nicholson's treatment notes, including her diagnoses and the medications she prescribed. Taylor has not demonstrated the ALJ's assessment of the evidence post-dating the opinions of Drs. Voyten and Richardson is unreasonable or unsupported by substantial evidence.

Accordingly, and for all the reasons set forth above, the Court finds the ALJ did not err

in determining there was no new or material evidence pertaining to Taylor's mental impairments during the time period at issue that would necessitate a change from the prior ALJ's RFC. Taylor's first assignment of error is without merit.

***Sentence Six Remand***

Taylor next argus this matter should be remanded for further administrative proceedings pursuant to Sentence Six of 42 U.S.C. § 405(g) because "new evidence, i.e., treatment notes from the HealthSpan psychiatric department, directly addresses [her] mental impairments and proves that the ALJ's [RFC] would have been different if this evidence had been available for review." (Doc. No. 15 at 19.) Taylor asserts this "new evidence" relates to two psychiatric clinic visits "which occurred just prior to the administrative hearing but were unavailable at that time." (*Id.* at 19-20.) *See* Tr. 886-896, 897-907. She argues this evidence is material because it demonstrates she continued to receive treatment for her bipolar disorder and, further, that her anger and depression worsened. (*Id.* at 20.)

The Commissioner argues remand is not warranted under Sentence Six because the evidence at issue is neither new nor material and Taylor failed to show good cause as to why it was not submitted prior to the hearing. (Doc. No. 17 at 15.) In this regard, the Commissioner notes the psychiatric treatment notes at issue each predate the June 2015 administrative hearing, and argues Taylor has failed to offer any meaningful explanation as to why they were not timely submitted to the ALJ. (*Id.* at 16.) Finally, the Commissioner argues the allegedly new evidence is not material because it is "merely cumulative of evidence already in the record." (*Id.* at 17.)

The Sixth Circuit has repeatedly held that "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial

evidence review." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). A district court can,

however, remand the case for further administrative proceedings in light of such evidence, if a

claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g).

*Id. See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of*

*Soc. Sec.*, 529 Fed. Appx. 706, 717 (6th Cir. July 9, 2013) (stating that "we view newly

submitted evidence only to determine whether it meets the requirements for sentence-six

remand"). Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before
> the Commissioner of Social Security, but only upon a showing that there is
> new evidence which is material and that there is good cause for the failure
> to incorporate such evidence into the record in a prior proceeding; and the
> Commissioner of Social Security shall, after the case is remanded, and after
> hearing such additional evidence if so ordered, modify or affirm the
> Commissioner's findings of fact or the Commissioner's decision, or both,
> and shall file with the court any such additional and modified findings of
> fact and decision, and, in any case in which the Commissioner has not
> made a decision fully favorable to the individual, a transcript of the
> additional record and testimony upon which the Commissioner's action in
> modifying or affirming was based.

42 U.S.C. § 405(g) (emphasis added).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was

'not in existence or available to the claimant at the time of the administrative proceeding.' "

*Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626). Evidence is "material" only if "there

is 'a reasonable probability that the Secretary would have reached a different disposition of the

disability claim if presented with the new evidence.'" *Id*. (quoting *Sizemore v. Sec'y of Health &*

*Human Servs.*, 865 F.2d 709, 711 (6th Cir.1988)). *See also Bass v. McMahon*, 499 F.3d 506, 513

(6th Cir.2007) (noting that evidence is "material" if it "would likely change the Commissioner's

decision."); *Courter v. Comm'r of Soc. Sec.*, 2012 WL 1592750 at * 11 (6th Cir. May 7, 2012)

(same).  Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the administrative hearing.  *See Prater v. Comm'r of Soc. Sec.*,---- F. Supp.3d ----, 2017 WL 588496 at * 2 (N.D. Ohio Feb. 14, 2017).  *See also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir.2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec.*, 2013 WL 5613751 at * 3 (6th Cir. Oct.15, 2013) (same).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357.  *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).  "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter*, 2012 WL 1592750 at * 11. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id*. (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)).  This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 2012 WL 1592750 at * 11.  *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant.  *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).  When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand [s] for further fact-finding." *Courter*, 2012 WL 1592750 at * 11. *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).  Under

these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also Melkonyan*, 501 U .S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

The Court finds Taylor has not demonstrated a sentence six remand is warranted. As an initial matter, Taylor has not demonstrated the evidence at issue is "new." The allegedly new evidence cited by Taylor consists of two psychiatric follow up visits with Nurse Nicholson, in January and May 2015. (Tr. 886-896, 897-907.) Both of these visits occurred prior to the June 2015 administrative hearing before the ALJ and, thus, the treatment notes were in existence at the time of the hearing. Taylor states summarily that these treatment notes were "not available" but provides no further explanation as to why these documents were not available to her at the time of the hearing. In the absence of any meaningful argument to the contrary, the Court finds Taylor has not demonstrated the January and May 2015 treatment notes at issue are "new" for purposes of sentence six remand.

Further, Taylor has failed to demonstrate "good cause" for failing to acquire and present these treatment notes to the ALJ prior to the administrative hearing. Taylor offers no justification, much less a "reasonable justification" as required under Sixth Circuit case law, for her failure to timely submit these notes to the ALJ. *Foster,* 279 F.3d at 357 (finding that, in order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.") Thus, the Court further finds Taylor has failed to satisfy the "good cause" requirement for a sentence six remand.

Finally, even if Taylor had demonstrated the treatment notes at issue were "new" and that she had "good cause" for failing to timely acquire and submit them, the Court finds Taylor has failed to demonstrate this evidence is "material." As noted above, evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.' " *Foster,* 279 F.3d at 357 (quoting *Sizemore*, 865 F.2d at 711). Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the hearing. *See Prater,*---- F.Supp.3d ----, 2017 WL 588496 at * 2.

Here, Taylor has not shown a reasonable probability that the ALJ would have reached a different decision had he been presented with Nurse Nicholson's January and May 2015 treatment notes. As the Commissioner correctly notes, Nurse Nicholson's mental status examination findings remained largely consistent with Taylor's previous examination findings. Specifically, during both of the new appointments, Nurse Nicholson observed normal behavior, appropriate speech, cooperative behavior, logical and coherent thought process, and good insight, judgment and memory. (Tr. 894, 905) Taylor did report increased depression and hearing "some talks in her head," as a result of which Nurse Nicholson increased two of her medications. However, Taylor has not shown a reasonable probability that, standing alone, this would have caused the ALJ to have reached a different conclusion. As noted above, the ALJ recognized Taylor suffered from severe mental impairments; was well aware of Taylor's treatment with Nurse Nicholson for these conditions; and fully accounted for Taylor's mental impairments in the RFC. Taylor has not identified any additional mental functional restrictions that she believes are supported by the treatment notes at issue, or otherwise articulated how these notes would have

changed the RFC had the ALJ reviewed them prior to the hearing.

Accordingly, and for all the reasons set forth above, the Court finds Taylor has failed to carry her burden of demonstrating a sentence six remand is warranted under the circumstances. Taylor's second assignment of error is without merit.

### VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 17, 2017

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).